IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

KAROLINA JANKULOSKI,

                    Plaintiff,          14-CV-6312

          -v-                           DECISION AND
                                          ORDER

CAROLYN W. COLVIN,
Commissioner OF Social Security,

                    Defendant.
_____

     Karolina Jankuloski ("plaintiff") brings this action under
Title II of the Social Security Act ("the Act"), claiming that the
Commissioner of Social Security ("Commissioner" or "defendant")
improperly denied her applications for supplemental security income
("SSI") and disability insurance benefits ("DBI").

     Currently before the Court are the parties' competing motions
for judgment on the pleadings pursuant to Rule 12(c) of the Federal
Rules of Civil Procedure.   For the reasons set forth below,
plaintiff's motion is denied and, defendant's motion is granted.

## PROCEDURAL HISTORY

     On January 21, 2011, plaintiff filed applications for DIB and
SSI alleging disability as of June 4, 2010 due to complex regional
pain syndrome ("CRPS"), fibromyalgia, post traumatic stress
disorder ("PTSD"), obsessive compulsive disorder ("OCD"), and
trigeminal neuralgia. Administrative Transcript ("T.") 122-133,
155. Following a initial denial of that application on October 19,

2011, plaintiff testified at a hearing, which was held at her request on October 18, 2012 before administrative law judge ("ALJ") Stanley Chin. T. 12-32. An unfavorable decision was issued on November 20, 2012, and a request for review was denied by the Appeals Council on April 7, 2014. T. 1-4, 42-60.

Considering the case *de novo* and applying the five-step analysis contained in the Social Security Administration's regulations (*see* 20 C.F.R. §§ 404.1520, 416.920), the ALJ made the following findings: (1) plaintiff met the insured status requirements of the Act through December 31, 2015; (2) she had not engage in substantial gainful activity since June 4, 2010, the date of the onset of her alleged disability; (3) her obesity, spinal impairments, fibromyalgia/CRPS, lower extremity impairments, face impairment, major depressive disorder, anxiety disorder, PTSD, OCD, herpes, and migraines were severe impairments; (4) her impairments, singly or combined, did not meet or medically equal the severity of any impairments listed in 20 CFR Part 404, Subpart P, Appendix 1; and (5) plaintiff had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), with the following limitations: a cane in her right dominant hand to stand and walk; no climbing ladders, ropes, or scaffolds; occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl; no exposure to moving machinery and unprotected heights; work limited to simple, routine, and repetitive tasks performed in

2

a work environment free of fast paced production requirements involving simple, routine decisions and changes; isolation from the public with occasional supervision and interaction with coworkers. T. 47-50.

With respect to finding number four, the ALJ found that plaintiff's physical and mental impairments did not meet or equal the criteria for any impairment listed in Appendix I to Subpart P, Regulations No. 4, specifically Listings 1.00 (musculoskeletal system), 12.04 (affective disorders), and 12.08 (personality disorders). T. 48. The ALJ further found that plaintiff's mental impairments did not meet the "paragraph B" criteria, as she had no marked limitations or any repeated episodes of decompensation of an extended duration, or "paragraph C" criteria. T. 48-49.

## DISCUSSION

### I.   General Legal Principles

42 U.S.C. § 405(g) grants jurisdiction to district courts to hear claims based on the denial of Social Security benefits. Section 405(g) provides that the District Court "shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g) (2007). The section directs that when considering such a claim, the Court must accept

3

the findings of fact made by the Commissioner, provided that such findings are supported by substantial evidence in the record.

When determining whether the Commissioner's findings are supported by substantial evidence, the Court's task is "'to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir.1999), *quoting Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir.1983) (per curiam). Section 405(g) limits the scope of the Court's review to two inquiries: whether the Commissioner's findings were supported by substantial evidence in the record as a whole and whether the Commissioner's conclusions are based upon an erroneous legal standard. *See Green-Younger v. Barnhart*, 335 F.3d 99, 105-106 (2d Cir.2003).

## II.  Relevant Medical Evidence

Plaintiff was assessed in June 2010 by Dr. Lisa Hauk at the Lifetime Health Medical Group for persistent left-side facial pain. T. 281-284.  Dr. Hauk noted that plaintiff had suffered a facial injury about a year earlier. T. 281.  The examination revealed no abnormalities, and Dr. Hauk referred plaintiff to a neurologist. T. 282. On December 22, 2010, plaintiff reported that the pain was worsening and had spread throughout her body. T. 288.  A physical examination conducted by nurse practitioner Susan Boyer-Reid revealed no abnormalities apart from obesity, but it was noted that

4

plaintiff was not capable of employment due to "major mental health and chronic pain issues." T. 291.

In 2008 and 2011 plaintiff was treated at the University of Rochester Medical Center's ("URMC") Department of Orthopaedics for left foot pain, and she was diagnosed with left regional pain syndrome of the lower extremity. T. 212-214.  During the 2011 examination, Dr. Judith Baumhauer noted that plaintiff had hypersensitivity to light touch in the left lower extremity, but was able to actively move her foot in each direction with palpable pulses and plantigrade foot alignment. T. 214, 329.

On October 25, 2010, plaintiff was examined for the Monroe County Department of Social Services ("DSS") by Dr. Harbinder Toor. T. 227-230.  Dr. Toor noted that plaintiff had: mild, atypical discomfort and slight tingling and numbness in the left side of her face and light discomfort and mild to moderate pain with tenderness and slight swelling in her left foot with a left-side limp; difficulty heel-to-toe walking due to left foot pain; 50% full squat; slight restriction of movement of left ankle, planar flexion 20 degrees, and dorsiflexion ten degrees. T. 228.  Dr. Toor further noted plaintiff's history of pain and possible reflex sympathetic dystrophy in the left lower leg and foot, atypical facial pain with tingling and numbness on the left side, OCD, and genital herpes. T. 228. Dr. Toor opined that plaintiff had the following functional limitations: could stand and walk for two to four hours in a work

day; lift or carry 20 pounds occasionally and 10 pounds frequently; and climb stairs two to four hours in a work day. T. 229. Plaintiff had a six-month working restriction limited to 20 hours weekly due to left foot pain and left-side facial pain, and she was limited from lifting over 20 ponds and standing or walking for a long time. T. 229.

X-ray imaging of plaintiff's left hip, taken on January 5, 2011, revealed minimal degenerative changes, normal bone configuration, grossly maintained right and left hips, and unremarkable findings. T. 299. Spinal x-ray imaging performed on February 12, 2011 revealed no spinal cord abnormalities, compression, or significant canal stenosis, but did show multilevel degenerative changes with the most severe neural foraminal narrowing on the right at C4-5. T. 267-268. Plaintiff's brain MRI, also taken on February 12, 2011, revealed no evidence of acute infarction, mass lesion, hydrocephalus, abnormal extra-axial collection or evidence of intracranial hemorrhage. The MRI revealed additional nonspecific findings common to diabetes and hypertension and mild sinus disease. T. 270, 312-315.

Neurologist Olga Selioutski evaluated plaintiff's facial and diffuse pain on January 31, 2011. T. 321-324. Following an examination, which was generally normal, Dr. Selioutski concluded that plaintiff's symptoms were not typical for trigeminal

neuralgia, but she suggested a trial of the nerve pain medication Tegretol, to which plaintiff was resistant. T. 324.

Following an evaluation by the Center for Pain Management at Rochester General Hospital ("RGH") in April 2011, plaintiff was assessed with chronic multisite pain with a significant psychological overlay to her description of her pain, which bordered on hypochondriasis. T. 333.  Treatment notes reveal that plaintiff complained about a large mass in her groin, yet despite having seen three surgeons for opinions regarding that area, no palpable mass was found upon examination. T. 333.  It was also noted that although plaintiff complained about RSD, there were "no signs or symptoms at the present time that would corroborate that diagnosis." T. 333.  Plaintiff also complained of "a mass lesion in her head that" she believed was "malignant, even though the records from Dr. Pettee impl[ied] otherwise." T. 333.  Plaintiff was ultimately discharged from the Center for Pain Management after failing to appear for appointments in August and November 2011. T. 431.

Plaintiff was treated at the URMC Allergy/Immunology/Rheumatology Clinic by Dr. Coca on May 17, 2011 for a pain evaluation. T. 240.  Plaintiff reported chronic pain in her foot and face and severe pain in her hip. T. 240.  Although plaintiff stated that her facial pain precluded her from much talking, Dr. Coca noted that it "was clearly not a problem" during

7

their encounter. T. 240. Plaintiff had a variety of psychiatric problems and recently started taking Cymbalta. T. 240. Dr. Coca's examination revealed no abnormalities apart from plaintiff report of wide-spread pain, and it was noted that plaintiff's psychiatric illness were likely contributing to her pain perception. T. 240-241. Dr. Coca further noted that plaintiff was not sleeping or exercising. T. 241.

On June 18, 2010, Dr. Allen Pettee at Greater Rochester Neurological Associates treated plaintiff for atypical facial pain. T. 253. He opined that while the pain could be RSD-related, plaintiff did not have the other autonomic nervous system findings to suggest RSD as a complication of her localized cheek injury from the prior year. T. 253. In a treatment note from November 18, 2010, Dr. Allen Pettee also concluded that although plaintiff's atypical facial pain did not include the "classical shock-like pain to establish a diagnosis of trigeminal neuraglia,[the pain could] still be trigeminal in origin." T. 250. Plaintiff agreed to try the medication Gabapentin for pain. T. 250. A head MRI showed only incidental right IAC contrast enhancement and entirely normal left trigeminal pathways. T. 250. On December 22, 2010, Dr. Pettee evaluated plaintiff for left-side facial pain, diffuse head and neck pain, and increasing left hip, groin, and thigh pain. T. 247-249. Dr. Pettee's examination revealed diffuse giveaway weakness in the left hip flexion, knee flexion and extension and hip

8

abduction and adduction, no left foot drop, reported diffuse left thigh pain with leg and hip manipulation, moderate left lateral hip point tenderness with minimal pain on the right, and mild inguinal tenderness. T. 248.  Noting that EMG testing of the left leg was benign, Dr. Pettee recommended x-ray studies of the left hip and an MRI for suspected lumbar spine disease. T. 249.  He noted that none of her thigh pain, inguinal hip pain, or left facial pain was specifically RSD-related, but that it could be due to fibromyalgia. T. 249.  Plaintiff did not begin taking Gabapentin due to her fear of the side effects. 248.

Dr. Pettee's examination on June 7, 2011 revealed increased right upper arm pain, diffuse trigger points and tenderness consistent with her fibromyalgia history, and several paresthesias along the right scapular border medially and superiorly. T. 244. The results of EMG studies were normal. T. 246.  Dr. Pettee opined that plaintiff "most likely" had isolated referred pain from cervical radiculopathy superimposed on a complicated history of multifactorial pain consistent with her fibromyalgia-related pain. T. 246.  He suspected "an element of a somatoform disorder complicating her fibromyalgia related pain." T. 246.  Dr. Pettee recommended cervical spine MRI, advising a formal pain management referral and pain medication if the MRI did not reveal severe disease. T. 246.

In June and August 2011, Dr. Kenneth Veenema, a orthopedist who treated plaintiff in 2009 for chronic groin pain, reevaluated plaintiff concerning multiple pain complaints. T. 344-350.  After several treatment sessions, Dr. Veenema concluded the following: "I certainly do not see anything based on the results of my examination, imaging, and guided injections to support musculoskeletal etiology of her chronic left groin pain." T. 344.

In September 2011, Dr. Toor performed another consultative examination, noting, among other things, plaintiff's diffuse pain complaints, fibromyalgia, RSD, and mental health history. T. 351. Plaintiff was experiencing moderate pain, presenting with a normal gait and stance and a left-side limp. T. 352.  She declined to squat, walk heel to toe, or lie down on the examination table, and she had difficultly changing and getting out of her chair. T. 352. Plaintiff had tenderness in the left-side cheek, multiple joints and her extremities and left-side neck pain. T. 353.  Plaintiff's musculoskeletal examination revealed reduced range of motion in her cervical and lumber spine, shoulders, left hip, left knee and left ankle and many trigger points for fibromyalgia. T. 353-354. Dr. Toor opined that plaintiff had moderate limitation standing, walking, and sitting for a long time; moderate to severe limitation bending or lifting;  moderate limitation pushing, pulling, and reaching; mild limitation grasping and holding; pain interfering with balance, chewing hard food and daily routine. T. 355.

When plaintiff returned to Dr. Pettee in January 2012 for an evaluation of recent right foot pain and numbness, his examination revealed exquisite tenderness throughout the right lower leg without a more distinct focal tenderness. T. 425. EMG testing was normal, and there was no definitive evidence of peripheral neuropathy or nerve entrapment contributing to her right foot pain. T. 426. Dr. Pettee opined that plaintiff's pain and numbness were consistent with her systemic syndrome, not an orthopaedic diagnosis, but he noted that some of plaintiff's specialists were questioning her fibromyalgia diagnosis. T. 426-427. In July 2012, Dr. Pettee completed a physical assessment form for the Monroe County Department of Human Services in which he opined that, due to her pain, plaintiff was unable to participate in any activities, except treatment and rehabilitation, for 12 months. T. 433. He further opined that she was able to walk, stand, sit, pushing, pull, bend, lift and carry for one to two hours, and see, hear and speak for two to four hours in an eight-hour work day. T. 434.

With respect to plaintiff's mental health, plaintiff was treated by therapist Saundra Weatherup for anxiety and OCD-related thoughts and behaviors. T. 335. In a December 30, 2010 report, Ms. Weatherup noted that plaintiff presented with an anxious to tearful, vindictive, paranoid and angry manner. T. 335. Plaintiff's depressive cognition was "very evident" with perception in normal limits and fair insight and judgment, but her though processes

11

indicated an inability to concentrate and focus due to depression, constant preservative thinking and compulsive behaviors. T. 336. Ms. Weatherup diagnosed plaintiff with depressive disorder complicated by PTSD that may have begun as a child, around the death of her sister. T. 336. Plaintiff's inability to repress those psychological features and arising physiological health problems played a primary role in her perception that she could not maintain employment or perform daily functions. T. 336.  Plaintiff was noncompliant with her treatment plan by refusing to engage in any medication management. T. 336. Ms. Weatherup's September 16, 2011 report was similar to her December 2010 report, and she concluded that it was "quite questionable whether [plaintiff was] willing to engage in the necessary therapy to address her diagnosed problems." T. 365.  Ms. Weatherup diagnosed plaintiff with recurrent and moderate major depressive disorder, PTSD, and OCD. T. 366.  In an attached form, Ms. Weatherup noted that plaintiff's response to treatment had been poor. T. 367.  Plaintiff refused to consider medication management, she did not engage in consistent treatment or appointments, and there was a question of manipulation in her failure to comply with treatment. T. 367.  Ms. Weatherup further noted that plaintiff "act[ed] intruded by internalized thoughts, and her attitude [could] be hostile, angry, tearful, manipulative, or cooperative. T. 368.

12

During a June 8, 2011 examination at Penfield OB-GYN, plaintiff denied depression or suicidal thoughts. T. 272. On September 1, 2011, Dr. Margery Baittle, Ph.D. examined plaintiff at the request of the Commissioner. T. 357-360. Dr. Baittle noted that plaintiff completed three years of college and had received help with reading and comprehension in her regular education program. T. 357. Plaintiff had no history of psychiatric hospitalizations, and she was currently being treated with biweekly therapy and daily doses of Cymbalta. T. 357. Plaintiff reported poor sleep, pain-related irritability, and OCD difficulties, and she complained of PTSD, but did not describe having symptoms of the disorder. T. 358. Dr. Baittle observed that plaintiff "forgets a lot of things" and has trouble learning, planning, and organizing. T. 358. Plaintiff was cooperative and quite tense, but she made adequate eye contact most of the time. T. 358. Her dress was casual and her hair disheveled, and her thought processes were confused, sometimes irrelevant and very circumstantial. T. 358. Plaintiff presented with a depressed affect, clear sensorium, good orientation, intact attention and concentration, intact recent and remote memory, and average cognitive functioning with poor insight and poor judgment at times. T. 359. Plaintiff did many things around the house, including cleaning, laundry, money management, and driving her 18-year-old daughter, with whom she lived. T. 359. She socialized with friends and had good family relationships. T. 358.

13

Dr. Baittle opined that plaintiff could follow and understand directions and maintain a regular schedule, but she had trouble with attention and concentration, learning new things, making appropriate decisions, relating to others and responding to stress. T. 359.  Dr. Baittle diagnosed plaintiff with OCD and concluded that plaintiff's psychiatric problems that "may significantly interfere with her ability for function on a daily basis." T. 359.

Psychologist Dr. E. Kamin prepared a psychiatric review technique form, dated October 17, 2011, following a review of the record.  T. 372-388.  Dr. Kamin found that, in assessing plaintiff's mental impairments against the "B" criteria of Listings 12.04 and 12.06, she had no marked limitations in any area or mental activity, related to a normal work day. T. 382, 386-387. Dr. Kamin opined that, based on the information received from plaintiff's treating source, she was "able to sustain simple work activities. T. 388.

### III. __Non-Medical Evidence__

Plaintiff testified that she was 5 feet and 2 inches tall and weighed about 190 pounds. T. 17.  Her daily activities included making quick and easy meals, cleaning her home "a little at a time," bathing slowly due to her pain, watching TV, and sleeping, among other things. T. 18-20. Plaintiff attended art classes at the Mental Health Coalition "as much as" she could, sometimes one or two days a week depending on her pain and availability of

transportation. T. 20. She occasionally socialized with friends. T. 28-29. Plaintiff felt that her OCD, depression, and pain prevented her from being able to work full time. T. 20.  Her OCD tendencies, such as counting how many times she squeezed the sponge, lack of motivation, and fatigue prevented her from completing chores. T. 25. She took Cymbalta and received treatment from her psychiatrist and her therapist three times a month. T. 20. Plaintiff testified that she felt pain "[a]ll over," and her physical condition and mental health had improved very little with conservative therapy. T. 20.  Standing,  sitting, or lying down for any length of time caused plaintiff to become stiff and sore. T. 25.  There was no indication at the time of the hearing that plaintiff was taking pain medication. T. 21.  Cymbalta, which was prescribed by her psychiatrist, Dr. Wolhtmann, was an anti-depressant intended "to help with the pain." T. 23.  Plaintiff testified that her pain worsened after she was diagnosed with RSD in 2008, and she began experiencing a burning sensation on her skin on her hands, back, and head. T. 27, 28.  She further testified that she was recently diagnosed with carpal tunnel syndrome. T. 28.

During the hearing, the ALJ posed a hypothetical to the VE, requesting an opinion whether an individual of plaintiff's age, education, and experience who could perform work with the following limitations: lift up to 10 pounds occasionally; stand and walk for at least two hours and sit for up to six hours in an eight-hour

workday; use a cane with the right hand to stand and walk; no climbing ladders, ropes or scaffolds; occasionally climb ramps and stairs; occasionally balance, stoop, kneel, crouch, and crawl; avoid all moving machinery and exposure to unprotected heights; make simple, work-related decisions with routine work place changes; work in isolation from the public with occasional supervision and interaction with coworkers. T. 30.   The VE responded that plaintiff could perform the sedentary, unskilled jobs of a mailroom clerk, of which there 25,042 jobs nationally and 3,358 jobs locally, and a document preparer, of which there are 33,000 jobs nationally and 2,300 jobs locally. T. 31.

The ALJ posed a second hypothetical with one additional limitation that such an individual would be off task 20 percent of the time. T. 31.  The VE opined that no jobs would be available for such an individual. T. 31.

## IV.  The Commissioner's Decision Denying Benefits is Supported by Substantial Evidence.

Here, the ALJ determined that plaintiff had the RFC to perform sedentary work with the following limitations:  no climbing of ladders, ropes, or scaffolds; occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl; no exposure to moving machinery and unprotected heights; simple, routine, and repetitive tasks performed in a work environment free of fast paced production requirements involving simple, routine decisions and changes; isolation from the public with occasional supervision and

16

interaction with coworkers; and use of a cane to stand and walk. T. 49.

"It is well-settled that 'the RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).'" *Hogan v. Astrue*, 491 F.Supp.2d 347, 354 (W.D.N.Y.2007), quoting Social Security Ruling 96-8p, 1996 WL 374184, at *7 (S.S.A.1996), citing *Balsamo v. Chater*, 142 F.3d 75, 80-81 (2d Cir.1998). In this case, after setting forth plaintiff's RFC, the ALJ summarized most of the medical evidence in the record, including treatment notes from plaintiff's medical providers from 2010 to 2012. T.50-54 The ALJ detailed plaintiff's extensive treatment history, including the assessments of her several treating sources, Dr. Baumhauer, the Center for Pain Management, and Dr. Pettee among them. The ALJ discussed how the medical evidence to which he referred and relied upon supported his conclusion that plaintiff could perform sedentary work with the above limitations.

The Court concludes the ALJ's RFC finding is supported by the medical evidence contained in the record, including diagnostic imaging, the many reports and opinions from her treating providers and consultative examiners, plaintiff's own testimony, and the VE's

opinion.  The ALJ's decision is therefore supported by substantial evidence in the record.

Plaintiff specifically asserts that the ALJ's decision is flawed because he failed to afford controlling weight to the opinion of Dr. Pettee in accordance with the treating physician rule.  Plaintiff's memorandum of law, p. 23-27.  Defendant responds that the ALJ properly discounted Dr. Pettee's opinion because it was not supported by the medical evidence in the record. Defendant's memorandum of law, p. 18-28 .

The medical opinion of a claimant's treating physician or psychiatrist will be given "controlling" weight if that opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Green-Younger*, 335 F.3d at 106. Medically acceptable clinical and laboratory diagnostic techniques include consideration of "'a patient's report of complaints, or history, [a]s an essential diagnostic tool.'" *Id.*, 335 F.3d at 107, quoting *Flanery v. Chater*, 112 F.3d 346, 350 (8th Cir.1997).

An associated proposition is the "good reasons" rule, which provides that the Commissioner "'will always give good reasons in its notice of determination or decision for the weight it gives [plaintiffs's] treating source's opinion.'" *Clark v. Commissioner of Social Sec.*, 143 F.3d 115, 118 (2d Cir.1998), quoting 20 C.F.R.

18

§§ 404.15279(d)(2) and 416.927(d)(2).  "Those good reasons must be 'supported by the evidence in the case record, and must be sufficiently specific.'" *Blakely v. Commissioner of Social Sec.*, 581 F.3d 399, 406 (6th Cir.2009), quoting Social Security Ruling 96-2p, 1996 WL 374188, at *5 (S.S.A.1996).  Insomuch as the "good reasons" rule exists to "ensur[e] that each denied claimant receives fair process" (*Rogers v. Commissioner of Social Sec.*, 486 F.3d 234, 243 [6th Cir.2007]), an ALJ's "'failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight' given '*denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.*'" *Blakely*, 581 F.3d at 407, quoting *Rogers*, 486 F.3d at 243.

Here, the ALJ stated that little weight would be accorded to Dr. Pettee's opinion that plaintiff was significantly limited from almost all work-related functioning. T. 53-54.  Contrary to plaintiff's contention, however, the ALJ went on to provide good reasons for giving little weight to Dr. Pettee's opinion.  T. 54. The ALJ wrote:

> The significant nature of [Dr. Pettee's] limitations are not substantiated by the [plaintiff's] medical evidence of record including little interest in appropriate treatment for her pains and problems as directed by medical personnel over more than a two-year period, mostly non-revealing diagnostic findings, and records from other specialists noting Waddell signs.

T. 54.

19

It is clear from the forgoing that the ALJ made specific findings with respect to the weight given to Dr. Pettee's opinion. After considering and discussing the records of more than ten medical providers, the ALJ properly discounted Dr. Pettee's opinions because they relied heavily on plaintiff's self-reporting, which was considered less than reliable by the ALJ for the clear and convincing reasons discussed below.  "An ALJ may reject a treating physician's opinion if it is based to a large extent on a claimant's self-reports that have been properly discounted as incredible." *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir.2008) (quotation marks omitted).  Dr. Pettee, a neurologist, made no definitive findings to establish RSD or trigeminal neuraglia. His x-ray, EMG, and needle studies showed no abnormalities, and his physical examinations revealed varying degrees of tenderness and weakness of plaintiff's lower left extremities and facial pain, which he opined "could" be due to fibromyalgia. T. 249, 253, 250.  Dr. Pettee's opinion concerning plaintiff's fibromyalgia and his severe limitations were based on plaintiff's reported pain, but were not sufficiently supported by the doctor's own treatment notes and the record as a whole.  As such, his opinion regarding plaintiff's impairments do not meet the standards provided under the Act and do not support a finding that the doctor's opinions were entitled to controlling weight. *See Green-Younger v. Barnhart*, 335 F.3d at 106.

20

The ALJ also afforded little weight to the opinion of nurse practitioner Boyer-Reid, whom he noted was "not an acceptable medical source" or a "mental health professional."  He gave some weight to Ms. Weatherup's opinion, noting that the treating therapist did not opine whether plaintiff was able to work and her notes raised the question of plaintiff's manipulation influencing the therapist's opinion. T. 54.   As a related matter, plaintiff contends that the ALJ also improperly assessed her credibility. Plaintiff's memorandum of law, p. 29-30.  Defendant responds that the ALJ properly considered the credibility of plaintiff's subjective complaints under the regulatory framework. Defendant's memorandum of law, p. 28.

It is well settled that to establish disability, there must be an underlying physical or mental impairment demonstrated by clinical and laboratory diagnostic techniques that could reasonably be expected to produce the symptoms alleged.  *See* 20 C.F.R. § 416.929(b); *Gallagher v. Schweiker*, 697 F.2d 82, 84 (2d Cir.1983). When a such an impairment exists, objective medical evidence, if available, must be considered in determining whether disability exists.  *See* 20 C.F.R. § 416.929 (c)(2).  Where plaintiff's symptoms suggest an even greater restriction of function than can be demonstrated by the medical evidence, the ALJ may consider factors such as her daily activities, the location, duration, frequency and intensity of pain, any aggravating factors,

21

the type, dosage, effectiveness, and adverse side-effects of medication, and any treatment or other measures used for pain relief.  *See* 20 C.F.R. § 416.929(c)(3); Social Security Ruling ("SSR 96-7p"), 1996 WL 374186, at *7.  It is well within the ALJ's discretion to evaluate the credibility of plaintiff's testimony and assess, in light of the medical findings and other evidence, the true extent of her symptoms. *See Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984); *Gernavage v. Shalala*, 882 F.Supp. 1413, 1419 (S.D.N.Y. 1995).

Although objective evidence may not always be present for a disease that eludes the measurement of pain, such as fibromyalgia, the ALJ raised and discussed numerous credibility issues in his decision. *See Green-Younger v. Barnhart*, 335 F.3d at 108. Plaintiff testified that she was prescribed the use of a cane, but none of her medical records mention the use of a cane, and the consultative physical examiner noted that she was not using any assistive devices. Plaintiff consistently failed to engage in treatment, keep treatment appointments, follow up with certain specialists, or take prescribed medications.  The record also reveals plaintiff's "numerous inconsistent reports such as having a tumor" and difficulty talking, her significant Waddell's signs, and her unsubstantiated reports of certain diagnoses and frequency of mental health treatment. In addition, plaintiff's treating

therapist questioned her honesty and noted the possibility of plaintiff's manipulation for benefits. T. 51-54.

All the concerns noted by the ALJ in his decision are supported by the medical evidence and treatment notes contained in the record. Reports from the Center for Pain Management, from which plaintiff was later discharged for noncompliance, reveal that although Dr. Baumhauer recommended that plaintiff visit a pain doctor concerning foot pain for RSD treatment, plaintiff never did so. T. 330. Plaintiff reported that physical therapy was not improve her pain, but she did not followed up with a pain therapist, injections, a pain clinic, or a surgeon. T. 330. Plaintiff eventually tried Gabapentin for her facial pain by taking half of the prescribed dose for two nights only. T. 330.

Based on the foregoing, it is clear that the ALJ considered the appropriate factors in assessing plaintiff's credibility, and, therefore, his credibility determination is supported by substantial evidence in the record.

The ALJ also properly assessed plaintiff's RFC, which accurately reflects her limitations as they are set forth and supported in the medical evidence contained in the record.

## CONCLUSION

For the foregoing reasons the plaintiff's motion for judgment on the pleadings is denied, and defendant's cross-motion for judgment on the pleadings is granted. The complaint is dismissed

in its entirety with prejudice.   The ALJ's decision denying plaintiff's claims for SSI and DIB is supported by the substantial evidence in the record.

ALL OF THE ABOVE IS SO ORDERED.


                              S/ MICHAEL A. TELESCA
                         HONORABLE MICHAEL A. TELESCA
                         UNITED STATES DISTRICT JUDGE
DATED: July 2, 2015
       Rochester, New York